UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

V CARS, LLC,

                              Plaintiff,

          - against -

ISRAEL CORPORATION,

                              Defendant.

**MEMORANDUM**
**OPINION & ORDER**

09 Civ. 8969 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          In this action, Plaintiff V Cars, LLC ("V Cars") asserts numerous claims against Defendant Israel Corporation related to an inchoate joint venture among V Cars, Israel Corp., and third-party Chery Automobile Co. ("Chery"), as well as claims related to Defendant's misappropriation of confidential business information obtained from V Cars during negotiations regarding the proposed joint venture.

          The Amended Complaint alleges that in late 2004 V Cars and Chery agreed to create a joint venture in which Chery would manufacture automobiles at its facilities in China and V Cars would import and distribute those vehicles in North America.  V Cars claims that it invited Israel Corp. to invest in the joint venture, and that Israel Corp. and Chery then proceeded to form a new joint venture without V Cars' involvement, using proprietary information obtained from Plaintiff.  (See Am. Cmplt.)

          Full discovery having been completed, Israel Corp. now moves for summary judgment, arguing, inter alia, that this Court lacks personal jurisdiction over it; that V Cars and Israel Corp. never entered into an agreement to form a joint venture; that Israel Corp. never made any promises or misrepresentations on which V Cars relied; and

that Israel Corp. is not using any information provided by V Cars in its current joint

venture with Chery.  (See Not. of Mot.; Def. Br.)

Because this Court concludes that it lacks personal jurisdiction over Israel

Corp., its motion for summary judgment will be granted.

## BACKGROUND

V Cars is a Delaware limited liability company, with its principal place of

business in New York, New York. (Am. Cmplt. ¶ 1)  Israel Corp. is a foreign corporation

organized under the laws of Israel. (Am. Cmplt. ¶ 2)  Chery is a Chinese car

manufacturer with its principal place of business in Wuhu, China.  (Am. Cmplt. ¶ 19;

Def. R. 56.1 Stmt. ¶ 2)[1]

In December 2004, V Cars, Chery, and a Chery subsidiary, entered into

two agreements – a Letter of Intent ("LOI") and an Importation and Distribution

Agreement ("IDA") – to form a joint venture company to manufacture cars in China,

with plans to export those cars to North America.[2]  (Pltf. R. 56.1 Stmt. ¶ 91)  In the LOI,

the parties expressed their intention, subject to several conditions, to form a joint venture

owned 60/40 by Chery and V Cars, respectively, to manufacture cars in China.  (Def. R.

56.1 Stmt. ¶ 3)  Under the IDA, V Cars has exclusive importation and distribution rights

---

[1]  To the extent that this Court relies on facts drawn from Local Rule 56.1 statements, it does so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).

[2]  The LOI contains both binding and non-binding provisions, and does not explicitly provide for its expiration.  (Pltf. R. 56.1 Stmt. Appx. Ex. 2 at V Cars, LLC 022898; Pltf. R. 56.1 Stmt. ¶ 93)  The parties dispute the terms of the LOI and the IDA, including when these agreements expire.  These disputes are not material to this Court's resolution of Defendant's motion.

for cars manufactured by the joint venture and exported to North America, and Chery has such rights elsewhere.  (Def. R. 56.1 Stmt. ¶ 4)  Chery agreed to contribute $300 million in assets to the joint venture entity (the "JV Company") that was to manufacture the cars for export.  (Pltf. R. 56.1 Stmt. ¶ 105)  V Cars agreed to contribute $200 million to the JV Company after it was formed and approved by the Chinese government.  (Id.)

In December 2005, V Cars and Chery entered into a Second Addendum to the LOI, which extended the deadline for V Cars' capital contribution, and set a schedule for V Cars to put $200 million in escrow.[3]  (Def. R. 56.1 Stmt. ¶ 7)  Section 2.2 of the Second Addendum states:  "[i]f [V Cars] does not make the first deposit [of $50 million] on time (by January 28, 2006), any and all cooperation between the Parties shall be canceled or terminated . . . and Chery shall be fully free to cooperate with any third party to develop the North American market. . . ."  (Def. R. 56.1 Stmt. ¶ 8, Ex. 11 at V Cars, LLC 000866)

In January 2006, Alan Himelfarb, V Cars' chief-of-staff, sent materials concerning V Cars' "proposed enterprise" to Pareto Securities, a Norwegian investment firm, for circulation to prospective investors.  (Def. R. 56.1 Stmt ¶ 14)  In March 2006, Pareto sent an email to Idan Ofer, Israel Corp.'s chairman, inviting Israel Corp. to invest in V Cars, and attaching V Cars' 2005 Business Plan.  (Def. R. 56.1 Stmt ¶ 15, Ex. 22; Pltf. Ex. 11)  Ofer was not asked to sign a non-disclosure agreement, confidentiality

---

[3]  V Cars contends that it signed the Second Addendum "under duress."  (Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 7)  V Cars maintains that Chery insisted that V Cars raise $200 million before Chery took steps to form the JV Company or obtain Chinese government approval.  (Pltf. R. 56.1 Stmt. ¶ 110)  Because V Cars hoped to maintain a business relationship with Chery, it began seeking an investor that could contribute the required $200 million.  (Pltf. R. 56.1 Stmt. ¶¶ 111-12)

agreement, or any other agreement as a condition of receiving such information, and he never signed any such agreement. (Def. R. 56.1 Stmt. ¶ 16)

In April 2006, Ofer asked Volker Steinwascher, a former Volkswagen executive living in Germany, to evaluate V Cars' "proposed business concept" and help Israel Corp. decide whether it should invest in the project.[4]  (Def. R. 56.1 Stmt. ¶ 18, see Ex. 2 (Ofer Decl.) ¶ 10; Ex. 23; Ex. 24 (Steinwascher Dep.) at 35, 41-45; Ex. 25 (Ofer Dep.) at 15-16))

On April 27, 2006, V Cars and Soros Strategic Partners, LLP ("Soros") entered into an Escrow Agreement, pursuant to which Soros would place $200 million in escrow to fund V Cars' contribution to the V Cars-Chery joint venture. (Pltf. R. 56.1 Stmt. ¶ 115, Ex. 4)  The Escrow Agreement contained an expiration date of October 27, 2006, by which time the funds would be returned to Soros. (Pltf. R. 56.1 Stmt. ¶ 122, Ex. 4 at V Cars, LLC 022835)  In July 2006, Soros advised V Cars that it had decided to rescind the funding. (Def. R. 56.1 Stmt. ¶ 10)

In late July 2006, Pareto Securities, the Norwegian investment firm, arranged for Steinwascher to meet Himelfarb and Per Arneberg, the Vice Chairman of V Cars' Board of Directors, in Nice, France. (Def. R. 56.1 Stmt. ¶ 21)  On August 9, 2006, Steinwascher emailed Ofer and

---

[4]  The parties dispute the nature of Steinwascher's relationship with Israel Corp.  Israel Corp. maintains that Steinwascher was an informal advisor, and that he did not have the authority to bind Israel Corp. (Def. R. 56.1 Stmt. ¶¶ 19-20)  At his deposition, Himelfarb admitted that he understood that Steinwascher was "not . . . able to commit to anything but always [had] to go back to Id[a]n [Ofer]," who would "mak[e] the final decisions." (Def R. 56.1 Stmt. ¶ 20, Ex. 10 (Himelfarb Dep.) at 88-89)  V Cars disputes this characterization of Steinwascher's role, but has not offered evidence demonstrating that Steinwascher had a formal relationship with Israel Corp. (See Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 19)

suggest[ed] the following steps to be taken:  Step 1:  Verification of major business assumptions and logics.  Step 2:  Due diligence for all business related aspects including profitability of JV, importer dealer and investor.  Step 3:  Due diligence for all contract and assets related issues.  Step 4:  Negotiation of the deal (including a higher share of profit). . . .

(Pltf. R. 56.1 Stmt. ¶ 159, Ex. 15)  Steinwascher was authorized to negotiate on behalf of Israel Corp., but was not authorized to sign or commit the company to anything.  (Pltf. R. 56.1 Stmt. ¶ 160; Pltf. R. 56.1 Stmt. Appx. Ex. C (Gilad Dep.) at 81)

Between August 15 and 18, 2006, Steinwascher visited V Cars' office in New York, and met with several V Cars executives, including Malcolm Bricklin, V Cars' CEO (Am. Cmplt. ¶¶ 4, 8), and Himelfarb, as well as an outside automotive consultant and Tim Ciasulli, a car dealer who had agreed to distribute the cars built by the potential joint venture.  (Pltf. R. 56.1 Stmt. ¶ 167)  V Cars' management understood that Steinwascher's role was to collect due diligence information and advise Israel Corp. whether or not he supported the joint venture opportunity.  (Pltf. R. 56.1 Stmt. ¶ 168)

V Cars contends that during this visit, Steinwascher signed V Cars' standard non-disclosure agreement.  Steinwascher does not recall ever signing any such agreement, however, nor has Plaintiff produced a copy of any such signed agreement.  (See Def. Resp. to Pltf. R 56.1 Stmt. ¶ 169)  The parties agree that Steinwascher was given a copy of V Cars' "North American Product Plan" ("NAPP") during his visit, but they otherwise dispute what information he received.[5]  (Pltf. R. 56.1 Stmt. ¶ 172)  V Cars maintains, however, that the NAPP contained non-public detailed information concerning

---

[5]  Steinwascher states that he received the following documents:  the NAPP; V Cars' 2006 North American Product Specification Plan; V Car's Private Placement Memorandum; V Cars' 2005 and 2006 Business Plans; a summary of an assessment of Chery's manufacturing capabilities conducted by Harbour & Associates; a proposal from Harbour & Associates to conduct further work; and a V Cars' promotional brochure. (Def. R. 56.1 Stmt. Appx. Ex.1 ¶ 37)

the cars to be produced by Chery, including "dimensions, weight, engine capabilities, whether the vehicle platforms were FWD, RWD, or AWD, vehicle platform capabilities, and the manufacturing costs for each platform."  V Cars further asserts that "it took [V Cars] months to obtain information that supported the NAPP."  (Pltf. R. 56.1 Stmt. ¶ 173)

The parties also dispute what statements and/or representations Steinwascher made during the New York meetings.  (See Def. Resp. to Pltf. R. 56.1 Stmt. ¶¶ 175-177)  Himelfarb testified that Steinwascher gave "the impression that he was going to highly recommend [that Israel Corp.] pursu[e] [the deal]," but that "he certainly felt that it was a challenging undertaking, that there was much to do."  (Def. R. 56.1 Appx. Ex. 10 at 64)  V Cars CEO Bricklin testified that Steinwascher did not make any promises in New York, but said that he thought that "this is something that Israel Corporation would be interested in."  (Def. R. 56.1 Stmt. Appx. Ex. 5 (Bricklin Dep.) at 86)

On August 25, 2006, Nir Gilad, then Israel Corp.'s Deputy CEO, emailed Himelfarb to set up a call to learn "a little [bit] more about next steps and in particular [w]hat kind of deal [Himelfarb] ha[d] in mind."  (Def. R. 56.1 Stmt. ¶ 24; Def. R. 56.1 Stmt. Appx. Ex. 114)  On August 27, 2006, Himelfarb sent Gilad a "proposal for valuation" of the $200 million investment.  (Pltf. R. 56.1 Stmt. ¶ 183, Ex. 20)  On September 1, 2006, Gilad visited V Cars' office in New York "for a couple of hours" to meet V Cars' leadership.  (Def. R. 56.1 Stmt. ¶ 24)  Although Plaintiff argues that Gilad signed a non-disclosure agreement at this time (see Pltf. Resp. to Def. R. 56.1 Stmt. ¶ 28), Gilad denies that he signed any such document, and once again there is no record of an executed agreement.  (Def. R. 56.1 Stmt. ¶¶ 28-29)  The parties dispute what documents

Gilad was given at the September 1, 2006 meeting, but Israel Corp. admits that at some point in August or September 2006, Gilad saw a V Cars "private placement document" and a business plan.  (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 191)

Himelfarb testified that, while there was "an intent to proceed," Gilad made no promises to V Cars at the September 1, 2006 New York meeting.  (Pltf. R. 56.1 Stmt. Appx. Ex. G (Himelfarb Tr.) at 67-68)  V Cars CEO Bricklin testified that "[t]he only promise that we got from anybody was they were going [to China] as our investors, and would not go around us."  (Pltf. R. 56.1 Stmt. Appx. Ex. B (Bricklin Tr.) at 110) Bricklin testified that he had "no idea" exactly what Gilad said at the September 1 meeting, however.  (Pltf. R. 56.1 Stmt. Appx. Ex. B (Bricklin Tr.) at 111)

In September 2006, Steinwascher and Himelfarb discussed what amount of equity ownership Israel Corp. would receive in return for its $200 million investment. (Pltf. R. 56.1 Stmt. ¶ 195)  Himelfarb took the position that V Cars should retain at least 51% of the 40% equity stake it had in the V Cars-Chery joint venture.  Steinwascher told Himelfarb, however, that Ofer and Gilad believed that Israel Corp. should receive at least 60% of V Cars' equity stake in return for its $200 million investment.  (Pltf. R. 56.1 Stmt. ¶ 196; Def. R. 56.1 Stmt. Appx. Ex. 41)

On September 11, 2006, Himelfarb sent an email to Bricklin stating that the parties' disagreement about equity stakes "creates an impasse, as [Ofer] expects more to have any further interest."  (Pltf. R. 56.1 Stmt. Appx. Ex. 23)  In the email, Himelfarb wrote that Steinwascher "says he is trying to keep the project alive, and proposes the following to re-open discussions:  15% for dealers, and one-third (28%) for [V Cars] and two-thirds (57%) for [Ofer]. . . ."  (Id.)

On September 12, 2006, Himelfarb sent an email to Steinwascher stating, "I spoke with both [Arneberg and Bricklin] who agree in principle with your one-third/two-third proposal.  We would like to take the next step with you, [Gilad], and [Ofer]."  (Pltf. R. 56.1 Stmt. Appx. Ex. 24)  Steinwascher reported to Ofer and Gilad that "we have a much better figure now for the investment" and suggested that they meet with Chery and V Cars.  (Pltf. R. 56.1 Stmt. Appx. Ex. 25 at IC_VCARS_PROD-051684)

In the second half of September 2006, Steinwascher and V Cars continued their discussions about a deal, in anticipation of setting up a meeting with Chery in China.[6]  On September 23, 2006, Arneberg reported to Kan Lei, a Chery senior executive, that Ofer "had approved to go ahead with the Chery/[V Cars] Project" and requested that they schedule a time for Steinwascher and Gilad to meet with Chery in China.  (Pltf. R. 56.1 Stmt. Appx. Ex. 28)  Kan Lei responded that no meeting could take

---

[6]  In a September 13, 2006 email to Bricklin and Arneberg, Himelfarb stated:  "I advised [Steinwascher] that this can only work if their visit is positioned as our investor coming to meet the management, view the factory, and discuss the terms and conditions of the L/C.  He assured me that this is their intention; they do not want to open the L/C with any plan to withdraw, so this visit would provide the confirmation they need to go forward." (Pltf. R. 56.1 Stmt. Appx. Ex. 27)

Himelfarb then sent the following email to Steinwascher:  "I have spoken with both [Bricklin] and [Arneberg] today who agree to the trip to China for you and Nir [Gilad], along with our senior management team, to meet Chery executives, visit the factory, and discuss the joint venture cooperation.  It is extremely important that we all agree the purpose of the visit is to introduce you and Nir as representatives of our new investor who will open the L/C for US$200 million upon satisfactory visit to Chery's facilities.  We must instill confidence in Chery that Idan [Ofer] is prepared to move forward immediately upon your recommendation, lest we suffer damage in our relationship with them by any delay in our follow-through."  (Pltf. R. 56.1 Stmt. Appx. Ex. 29)

place before October 10, 2006, and that "200 million USD cash must be secured before our meeting."[7]  (Id.)

On September 19, 2006, Himelfarb asked Steinwascher to arrange for Ofer to send a letter to Chery's CEO, and provided draft language.  (Def. R. 56.1 Stmt. ¶ 36, Ex. 47)  In Himelfarb's draft, Ofer stated that he was "prepared to fund [V Cars'] contribution to your joint venture."  (Id.)  In the version actually sent by Ofer to Chery's CEO on September 28, 2006, however, Ofer stated that he was "considering funding [V Cars'] contribution to your joint venture."  (Pltf. Resp. to Def. R. 56.1 Stmt ¶ 37; Def. R. 56.1 Stmt. Appx. Exs. 47-48)  In the letter, Ofer offered to have Israel Corp.'s bank issue a letter confirming its ability to make a $200 million investment "within days," but cautioned that "before any investment can be made we will have to jointly prepare a business plan and finalize the required agreements."  (Def. R. 56.1 Stmt. Appx. Ex. 48)

In early October, the parties exchanged several emails concerning a possible meeting in China.  (Def. R. 56.1 Stmt. Appx. Ex. 50)  Chery resisted scheduling a meeting.  (Def. R. 56.1 Stmt. Appx. Ex. 45)  On October 9, 2006, Himelfarb asked Steinwascher for help in persuading Kan Lei to agree to a meeting.  (Def. R. 56.1 Stmt. Appx. Ex. 50)  Steinwascher contacted Kan Lei and assured him that Israel Corp. had the financial resources to make the investment "in the event that it decided to participate in the project."  He also told Kan that it was essential for the meetings in China to go

---

[7] On September 18, 2006, Arneberg forwarded to Steinwascher an email Arneberg had sent to V Cars' executives memorializing a conversation he had with Kan Lei on September 17, 2006.  In the email, Arneberg reports that Kan said that the "President of Chery, local government, and Beijing by now has lost faith in the ability of Mr. [Bricklin] and [V Cars] to come up with the required $200 Million."  Arneberg also stated that Kan believed that "Chery is fully free to work with anyone they wish – and have no commitment to [V Cars]."  (Pltf. R. 56.1 Stmt. Appx., Ex. 31)  Steinwascher reported this information to Ofer.  (Pltf. R. 56.1 Stmt. Appx. Ex. M at 119)

forward – including the meeting between Ofer and Chery's CEO – and that Israel Corp.

would not consider funding the project before such a meeting.  (Def. R. 56.1 Stmt. Appx.

Ex. 1 ¶ 57)  Chery subsequently agreed to several days of meetings in Wuhu, China in

mid-October.  (Def. R. 56.1 Stmt. ¶ 40)

        While negotiating with Israel Corp. in September and October 2006 about

an investment in the joint venture with Chery, V Cars simultaneously pursued alternative

investors for the project.  For example,

- On September 19, 2006, Himelfarb sent an email to Bricklin discussing other possible investors, suggesting that "we might want to bring a consortium of investors [to China] so they can compete for the opportunity, allowing us to select the best offer."  (Def. R. 56.1 Stmt. Appx. Ex. 61)

- On October 12, 2006, Himelfarb sent an email advising Bricklin of the status of negotiations with Bear Stearns and iStar, recommending a "follow up contingent next week if Kan/Yin are amenable and ONLY IF Bear/Istar are ready to commit under better terms" than those offered by Israel Corp.  (Def. R. 56.1 Stmt. Appx. Ex. 62 (V Cars, LLC 043112); Ex. 10 (Himelfarb Dep.) at 121; Ex. 63 (Bricklin 30(b)(6) Dep.) at 63-65)

- On October 26, 2006, Himelfarb sent an email to Bricklin stating:  "Given Chery's deep respect for him, Volker [Steinwascher] will be an important piece of the puzzle if Istar makes a reasonable offer.  We will need to win him over to our side if/when we attempt to replace Ofer."  (Def. R. 56.1 Stmt. Appx. Ex. 65 (V Cars, LLC 091731); Ex. 10 (Himelfarb Dep.) at 161-162)

        Himelfarb, Arneberg, Maurice Strong – an advisor to V Cars –

Steinwascher, Gilad, Ofer, Kan Lei, and Yin (Chery's CEO), attended a series of

meetings in Wuhu, China in mid-October 2006.  (Def. R. 56.1 Stmt. ¶¶ 40-41)  During

the meetings, Kan told Israel Corp.'s representatives, in the presence of Himelfarb and

Arneberg, that there was no commitment between Chery and V Cars, that Chery was

upset that V Cars had not yet secured the $200 million investment, and that Chery wanted to make Israel Corp. a direct partner in the joint venture.  (Pltf. R. 56.1 Stmt. ¶ 238)

Ofer told Chery that he wanted to invest directly in the joint venture without any involvement by V Cars.  (Pltf. Appx. Ex. M. ("Steinwascher Arb. Test.") at 134)  As described by Himelfarb, Ofer "told Chery that he wanted to invest directly in the JV, didn't know anything about [V Cars], not really interested in [the] US, etc. . . . He had the nerve to say why should he invest in [V Cars] when we had done nothing. . . . Then he asked Chery[,] why the $200 million escrow[,] and would it be necessary if he came without [V Cars].  Kan again said [that] without [V Cars], it would not be necessary."  (Pltf. R. 56.1 Stmt. Appx. Ex. 40)

On October 15, 2006, shortly after the Wuhu meetings concluded, Ofer sent an email to Yin and Kan Lei stating, "[a]s discussed we shall endeavor to find a 'right' solution for [V Cars] so that their efforts to date, are used to OUR benefit."  (Pltf. R. 56.1 Stmt. Appx. Ex. 36) (emphasis in original).  Soon thereafter, Steinwascher and Gilad proposed to V Cars a new structure for Israel Corp.'s investment, in which only Israel Corp. and Chery would hold equity in the manufacturing joint venture, and V Cars would participate in the joint venture's profits, receiving 15% of Israel Corp.'s share.  (Pltf. R. 56.1 Stmt. ¶ 254; Def. R. 56.1 Stmt. ¶ 43)  The distribution entity would be owned 70% by Israel Corp. and 30% by V Cars, with the same profit split discussed above.  (Pltf. R. 56.1 Stmt. ¶ 254; Def. R. 56.1 Stmt. ¶ 44)

Himelfarb made two counter-proposals.  (Def. R. 56.1 Stmt. ¶ 45)  The first was that Israel Corp. would hold 100% of the equity in the manufacturing joint venture, with Israel Corp. and V Cars splitting profits 85%/15%, and that V Cars would

hold 100% of the equity in the distribution venture, with Israel Corp. and V Cars splitting the profits 15%/85%.  (Def. R. 56.1 Stmt. Appx. Ex. 55)  The second proposal was for Israel Corp. to purchase V Cars' interest in the V Cars-Chery joint venture for $50 million.  (Id.)  While there were subsequent discussions between Himelfarb and Steinwascher, Steinwascher told Himelfarb that Israel Corp.'s newly proposed equity and profit sharing structure was "not open" for discussion.  (Def. R. 56.1 Stmt. Appx. Ex. 56)

On October 23, 2006, Himelfarb sent an email to Steinwascher stating that V Cars agreed "with the idea of going forward with the feasibility study based on your proposal for equity and profit share between [V Cars] and Israel Corp.  We are prepared to take the next step, have Ofer open the escrow, and begin the feasibility study in earnest."  (Def. R. 56.1 Stmt. Appx. Ex. 57)  Steinwascher forwarded that email to Gilad, with his own comment that "[t]his is the outcome of a lot of discussions with [V Cars] in the last days.  This reflects 1.  the acceptance of our proposal for equity and profit sharing . . . I hope you agree with this proposal."  (Pltf. R. 56.1 Stmt. Appx. Ex. 53 at IC_VCARS_PROD-007263)  On October 25, 2006, Israel Corp. sent a letter to Chery, with copies to V Cars, "confirm[ing] that we have developed [a] solution with [V Cars] to the satisfaction of both parties."  (Def. R. 56.1 Stmt ¶ 48, Ex. 58)  On October 26, 2006, V Cars confirmed to Chery that they had "agreed on workable terms" with Israel Corp. (Def. R. 56.1 Stmt. ¶ 49, Appx. Ex. 59)

On November 22, 2006, however, Bricklin publicly announced that V Cars was no longer pursuing a potential deal with Chery.  (Def. R. 56.1 Stmt. ¶ 58; Def. R. 56.1 Stmt. Appx. Ex. 71)  That same day, Himelfarb sent an email to Yin stating that V Cars had

> decided to withdraw from the current negotiations concerning a minority interest
> in a joint venture with you.  Given the state of your product development, we do
> not believe it is in the best interest of all parties to attempt to re-engineer existing
> products for North America.

(Def. R. 56.1 Stmt. Appx. Ex. 73)  Also on November 22, 2006, Bricklin sent an email to

Ofer stating that

> [a]fter much consideration, we have decided that a cooperation with you in a joint
> venture with Chery and distribution in North America would not be in the best
> interest of all parties concerned.  As such, please consider this our official notice
> that we do not intend to continue discussions with you in regard to this structure.

(Def. R. 56.1 Stmt. ¶ 60, Appx. Ex. 74)  The email also stated:  "Given that we met this

week in Beijing with Dr. Kan and are currently negotiating with Chery, we respectfully

ask that you withdraw from any further contact with Chery."  (Def. R. 56.1 Stmt. Appx.

Ex.74)

On November 28, 2006, Israel Corp. and Chery entered into a non-

disclosure agreement.  (Pltf. R. 56.1 Stmt. ¶ 283)  On November 29, 2006, Gilad sent a

letter to V Cars expressing "surprise" at its withdrawal, noting that the two companies

"had reached agreement on a basis for a proposed joint venture with Chery," and advising

that Israel Corp. "would still be interested in pursuing a joint venture with your

participation."  (Def. R. 56.1 Stmt. ¶ 61, Appx. Ex. 75)  The letter also stated that Israel

Corp. believed it was "free to pursue negotiations with Chery," noting that Chery had

"expressed significant doubts about concluding a business arrangement with [V Cars],"

and had stated that "there are no existing agreements or understandings between Chery

and [V Cars]."  (Id.)  V Cars did not respond to Israel Corp.'s November 29, 2006 letter.

(Def. R. 56.1 Stmt. ¶ 62)

On December 14, 2006, Israel Corp. and Chery entered into an escrow agreement in which Israel Corp. agreed to contribute $200 million in cash, and Chery agreed to contribute $300 million in cash or kind, to establish a joint venture company that would develop, manufacture, and distribute automobiles "for worldwide markets." (Pltf. R. 56.1 Stmt. ¶ 289, Appx. Ex. 55)  On December 18, 2006, Israel Corp. and Chery entered into a Memorandum of Understanding to form a joint venture company (Pltf. R. 56.1 Stmt. ¶ 290), and on February 17, 2007, a subsidiary of Chery and a subsidiary of Israel Corp. entered into a joint venture agreement.  (Def. R. 56.1 Stmt. ¶ 66)

V Cars argues that the joint venture between the Chery and Israel Corp. subsidiaries is similar to the joint venture V Cars had developed with Chery.  (Pltf. R. 56.1 Stmt. ¶¶ 298-303)  For example, V Cars asserts that the cars slated for production by the new joint venture are largely the same as the cars V Cars had planned to sell under the NAPP; that the new joint venture also plans to sell cars under a "unique brand name"; and that production numbers are the same.  (Pltf. R. 56.1 Stmt. ¶ 298-302)  Israel Corp. asserts that a business plan for the Israel Corp./Chery joint venture was not created until 2010, and that the joint venture decided to engineer a "new generation of cars":  "the joint venture made no use of any of the documents or information that [V Cars] provided . . . ."  (Def. Resp. to Pltf. R. 56.1 Stmt. ¶ 298; Def. R. 56.1 Stmt. Appx. Ex. 1 (Steinwascher Decl.) ¶¶ 89-91)

The joint venture between Israel Corp. and Chery is registered under the name Qoros Automotive Co., Ltd., and is headquartered in Shanghai.  (Def. R. 56.1 Stmt. ¶¶ 70-71)  In November 2011, Qoros announced plans to manufacture mid-market cars at a new facility in Changshu, China, for sale primarily in China beginning in late 2013.

(Def. R. 56.1 Stmt. ¶¶ 74, 78, 86)  Qoros also announced that it has no plans to introduce vehicles into the United States market.  (Def. R. 56.1 Stmt. ¶ 87)

V Cars filed this action on October 23, 2009.  (Dkt. No. 1)  On March 3, 2010 – after Israel Corp. had filed a pre-motion letter asserting that the Complaint provided no basis for this Court to exercise personal jurisdiction over it (Feb. 23, 2010 Def. Ltr. 3) – this Court directed V Cars to file an Amended Complaint setting forth a factual basis for the exercise of personal jurisdiction over Israel Corp.  (Dkt. No. 22)  On March 31, 2010, V Cars filed an Amended Complaint.  (Dkt. No. 23)

The Amended Complaint pleads claims for promissory estoppel (Count I), wrongful termination of partnership and/or joint venture (Count II), breach of fiduciary duty (Count III), fraud and/or negligent misrepresentation and/or fraudulent inducement and/or fraudulent concealment (Count IV), tortious interference with contract (Count V), misappropriation of trade secrets (Count VI), conversion (Count VII), quantum meruit (Count VIII), civil conspiracy (IX)[8], unjust enrichment (Count X), an accounting (Count XI), and unfair completion (Count XII).

Israel Corp. moved for summary judgment on February 27, 2011.  (Dkt. No. 84)

## RELATED LITIGATION

Before initiating the instant action, V Cars sued Chery, several of its officers, and Israel Corp. in the United States District Court for the Eastern District of Michigan.  See V Cars, LLC v. Chery Auto. Co., No. 2:08-cv-13113 (E.D. Mich. July 20, 2008) (Dkt. No. 1 (Cmplt.).  On March 20, 2009, that court issued an order dismissing V

---

[8]  Plaintiff withdrew this cause of action by letter dated April 22, 2010.  (Apr. 22, 2010 Pltf. Ltr. 8)

Cars' claims against Israel Corp. for lack of personal jurisdiction.  (<u>Id</u>. Dkt. No. 46)  On

February 4, 2010, the court granted Chery's motion to compel arbitration in the Hong

Kong International Arbitration Centre.  (<u>Id</u>. Dkt. No. 65)  That arbitration is currently

pending.  Case No. HKIAC/ARB/100223/R8002.1.  (Pltf. Br. 2 n.1)

<strong><u>DISCUSSION</u></strong>

## I.  <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

Summary judgment is warranted where the moving party shows that

"there is no genuine issue as to any material fact" and that it "is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for

summary judgment purposes where the evidence is such that a reasonable jury could

decide in the non-movant's favor."  <u>Beyer v. Cnty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir.

2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party

opposing summary judgment."  <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir.

2001).

## II.  <u>PERSONAL JURISDICTION</u>

Israel Corp. argues that it is entitled to summary judgment because the two

prefatory meetings in New York, and the emails and telephone calls to and from New

York, do not provide a sufficient basis for the exercise of personal jurisdiction.  (Def. Br.

at 16-20)  Plaintiff argues that Israel Corp. has waived the personal jurisdiction issue, and

that, in any event, Israel Corp. had sufficient contacts with New York to justify the

exercise of personal jurisdiction over it.  (Pltf. Br. at 3-8)

The waiver issue is quickly addressed.  Under Fed. R. Civ. P. 12(h)(1)(b)(ii), a party waives a personal jurisdiction defense when it fails to assert this defense in a motion or "in a responsive pleading."  Israel Corp. pleaded lack of personal jurisdiction in its Answer.  (Dkt. No. 29 at ¶ 127)[9]  Accordingly, there has been no waiver.

### A.    **Applicable Law**

"A federal district court presiding over a diversity action must look to the forum state's general jurisdiction statute or long-arm statute to determine whether personal jurisdiction exists over a nonresident defendant."  Benson and Assocs., Inc. v. Orthopedic Network of New Jersey, No. 98 Civ. 1020(LMM), 1998 WL 388531, at *2 (S.D.N.Y. July 13, 1998) (citing Savin v. Rainer, 898 F.2d 304, 306 (2d Cir. 1990) (citing Arrowsmith v. United Press Int'l, 320 F.2d 219, 222–25 (2d Cir.1963))).

New York's long-arm statute provides that

> a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:  1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state . . . ; or 3. commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. . . .

N.Y. C.P.L.R. § 302(a) (McKinney 2008).

The exercise of personal jurisdiction must also comport with constitutional due process principles.  "In this case, because the plaintiff['s] assertion of personal

---

[9] Israel Corp. also raised the personal jurisdiction issue in a pre-motion letter to the Court (Feb. 23, 2010 Def. Ltr. 3), which then directed V Cars to amend its complaint to provide a factual basis for the exercise of personal jurisdiction.  (Dkt. No. 22)

jurisdiction rests upon a state long-arm statute, the relevant constitutional constraints are

those imposed by the Due Process Clause of the Fourteenth Amendment."[10]  Licci ex rel.

Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012) (citation

omitted).  "Where, as here, the plaintiff[] premise[s] [its] theory of personal jurisdiction

upon the New York long-arm statute, [courts] first consider whether the requirements of

the statute have been satisfied before proceeding to address whether the exercise of

jurisdiction would comport with the Due Process Clause."  Id.

      **A.**     **Jurisdiction Based on Transacting Business**

      "To determine the existence of jurisdiction under section 302(a)(1), a

court must decide (1) whether the defendant 'transacts any business' in New York and, if

so, (2) whether this cause of action 'arises from' such a business transaction."  Best Van

Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (citation omitted).  "[T]he

overriding criterion necessary to establish a transaction of business is some act by which

the defendant purposefully avails itself of the privilege of conducting activities within

New York."  Licci, 673 F.3d at 61 (citation omitted).  "As to § 302(a)(1)'s second

requirement, 'a suit will be deemed to have arisen out of a party's activities in New York

if there is an articulable nexus, or a substantial relationship, between the claim asserted

and the actions that occurred in New York.'"  HSH Nordbank AG New York Branch v.

---

[10]  "The constitutional analysis under the Due Process Clause consists of two separate
components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry.  The
'minimum contacts' inquiry requires us to consider 'whether the defendant has sufficient
contacts with the forum state to justify the court's exercise of personal jurisdiction.'  The
'reasonableness' inquiry requires us to decide 'whether the assertion of personal
jurisdiction comports with "traditional notions of fair play and substantial justice" – that
is, whether it is reasonable to exercise personal jurisdiction under the circumstances of
the particular case.'"  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50,
60 (2d Cir. 2012) (internal citations omitted).

Street, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at *4 (S.D.N.Y. July 18, 2012)

(citing Licci, 673 F.3d at 66).  "A single act within New York will, in the proper case,

satisfy the requirements of section 302(a)(1)."  Licci, 673 F. 3d at 62 (citing Deutsche

Bank Sec., Inc. v Montana Bd. of Invs., 7 N.Y.3d 65, 72 (2006)) ("[W]hen the

requirements of due process are met, as they are here, a sophisticated institutional trader

knowingly entering our state – whether electronically or otherwise – to negotiate and

conclude a substantial transaction is within the embrace of the New York long-arm

statute.")).

> Israel Corp. argues that it did not transact business in New York within the
meaning of Section 302(a)(1).  (Def. Br. at 17-19)  It argues that "acts prefatory to the
transaction of business, despite occurring in New York, are insufficient in themselves to
confer jurisdiction."  (Id. at 18)  V Cars counters that Israel Corp.'s contacts with New
York were purposeful, and bear a substantial relationship to the causes of action set forth
in the Amended Complaint.  (Pltf. Br. at 5)  V Cars notes that the meetings in New York,
and the emails and phone calls to and from New York, are the basis for its claims
grounded in partnership, misrepresentation, promissory estoppel, fraud, misappropriation
of trade secrets, and unfair competition.  (Id.)  This Court finds that V Cars has not
demonstrated that Israel Corp. was transacting business in New York within the meaning
of New York's long-arm statute.

> "In applying the long-arm statute, 'New York courts have cautioned . . .
that "defendants, as a rule, should be subject to suit where they are normally found, that
is, at their pre-eminent headquarters, or where they conduct substantial business
activities.  Only in a rare case should they be compelled to answer a suit in a jurisdiction

with which they have the barest of contact."'" Aquiline Capital Partners LLC v. Finarch
LLC, No. 11 Civ. 3684, 2012 WL 1764218, at * 6 (S.D.N.Y. May 17, 2012) (quoting
Hutton v. Priddy's Auction Galleries, 275 F. Supp. 2d 428, 439 (S.D.N.Y. 2003) (citing
McKee Elec. Co. v. Rauland–Borg Corp., 20 N.Y.2d 377, 383 (1967)).

   In determining whether an out-of-state defendant has transacted business
in New York within the meaning of CPLR § 302(a)(1), the Second Circuit has
considered, inter alia, "'whether the defendant has an on-going contractual relationship
with a New York corporation, . . . [and] whether the contract was negotiated or executed
in New York, and whether after executing a contract with a New York business, the
defendant has visited New York for the purpose of meeting with parties to the contract
regarding the relationship. . . .'" Aquiline Capital Partners LLC, 2012 WL 1764218, at *
6 (quoting Agency Rent A Car Sys. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir.
1996) (internal citations omitted)). Here, of course, there is no claim – and there could be
no valid claim – that V Cars and Israel Corp. ever entered into a contract. Accordingly,
V Cars is arguing that meetings and communications that concededly never resulted in a
contract provide a basis for the exercise of personal jurisdiction.

   "New York courts have held[, however,] that . . . exploratory meetings
taking place in New York, 'leading to nothing more than a proposal that was itself the
subject of further negotiations over the phone, by mail, and in meetings outside New
York,' are not sufficient contacts to constitute the transaction of business within the
meaning of CPLR 302(a)(1)." Id. (quoting C-Life Group Ltd. v. Generra Co., 235
A.D.2d 267, 267 (1st Dept. 1997)); see also Benson & Assocs. Inc., 1998 WL 388531, at
*4 ("meetings in the forum state that are exploratory, unproductive, or insubstantial are

insufficient to establish requisite contacts with the state") (citing <u>PaineWebber Inc. v.</u>
<u>WHV, Inc.</u>, No. 95 Civ. 0052 (LMM),1995 WL 296398, at *3 (S.D.N.Y. May 16, 1995)).

Here, the only meetings that occurred in New York were "exploratory."
As V Cars has explicitly conceded, neither Steinwascher nor Gilad promised anything to
V Cars at the New York meetings, nor did the parties negotiate any agreement during
those meetings.  Instead, V Cars made presentations to Steinwascher and Gilad about
their business plans, and Steinwascher and Gilad expressed interest in further discussions.
These contacts are not sufficient to provide a basis for the exercise of personal
jurisdiction under CPLR § 302(a)(1).

In <u>WHV, Inc.</u>, 1995 WL 296398, at *3, for example, the court granted a
motion to dismiss based on lack of personal jurisdiction where plaintiff relied on
telephone calls from and to New York and occasional meetings in New York.  The court
noted that "[t]elephone calls are insignificant for purposes of jurisdiction except when
defendants use the telephone to actively participate in business transactions in New
York."  <u>WHV, Inc.</u>, 1995 WL 296398, at *3 (citing <u>Parke-Bernet Galleries, Inc. v.</u>
<u>Franklyn</u>, 308 N.Y.S.2d 337 (1970) (finding jurisdiction over a defendant who
participated in an auction by telephone); <u>PaineWebber, Inc. v. Westgate Group, Inc.</u>, 748
F. Supp. 115, 119 (S.D.N.Y. 1990) (finding frequent phone calls and telecopies to
PaineWebber's office in New York insufficient for jurisdictional purposes when the
defendant did not intend to transact business in New York); <u>United States Theatre v.</u>
<u>Gunwyn/Lansburgh Ltd. P'ship.</u>, 825 F. Supp. 594, 596 (S.D.N.Y. 1993) (finding
defendant's "substantial" communication with the plaintiff in New York insufficient to
find jurisdiction when the defendant never intended to do business in New York).

The court likewise noted that "occasional meetings in the forum state that are exploratory, unproductive or insubstantial are insufficient to establish requisite contacts with the state."  (Id. citing PaineWebber, 748 F. Supp. at 115) (finding a meeting in New York insufficient to meet the "transacting business" standard when a purchase agreement modified at the meeting was negotiated in Texas); Pryor v. Haisfield, 1990 WL 165687 (S.D.N.Y. 1990) (exploratory meetings in New York insufficient even though defendant contracted for services to be performed in New York); Saudi Computer Aided Translation v. Weider Comm., 663 F. Supp. 1104 (S.D.N.Y. 1987) (an unproductive and insubstantial meeting in New York may be insufficient to constitute transacting business)).

In granting defendant's motion to dismiss, the WHV, Inc. court found that "during the three-year duration of the Agreement, [Defendant's] representatives came to New York only for three minor meetings.  These meetings did not involve contract negotiations, no contracts were signed, and the March 2, 1993 meeting was unproductive since it did not, as planned, result in the expansion of PaineWebber's efforts to sell [Defendant].  These events were no more than 'random' and 'attenuated.'"  (Id.)  The same is true here, given that the New York meetings, and the telephone and email contacts, did not result in a contractual relationship.

While courts in this district have found that "[p]reliminary negotiations in New York that are 'essential to the existence of the contract' provide sufficient contact to establish New York's personal jurisdiction over [a] non-domiciliary defendant."  Nee v. HHM Fin. Sers., Inc., 661 F. Supp. 1180, 1184 (S.D.N.Y. 1987) (quoting Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1531 (S.D.N.Y. 1985) citing M.L. Byers,

Inc. v. HRG Prods., Inc., 492 F. Supp. 827, 831 (S.D.N.Y. 1980)); see also Lehigh Val.
Indus., Inc. v. Birenbaum, 527 F.2d 87, 90 (2d Cir. 1975); Current Textiles Corp. v. Ava
Indus., Inc., 624 F. Supp. 819, 820 (S.D.N.Y. 1985) (stating that under the Second
Circuit's Lehigh test, only in-forum negotiations that "substantially advance" or are
"essential" to formation of business agreement will support a legally sufficient basis for
jurisdiction), here, no contract was ever formed.  Accordingly, these preliminary
meetings were not "essential" to a contract and cannot provide a basis for the exercise of
personal jurisdiction).  See Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423,
444 (S.D.N.Y. 2006) ("[A]bsent a distinct communication to be bound, a statement by
one party to another that evinces the speaker's desire to consummate or further a
commercial transaction does not constitute a clear and umambiguous promise."); PCS
Sales (USA), Inc. v. Nitrochem Distribution LTD., No. 03 Civ. 2625 (SAS), 2004 WL
944541, at *4 (S.D.N.Y. May 3, 2004) (quoting Strippit, Inc. v. Household Util., Inc., No.
88 Civ. 1173, 1989 WL 103673, at *5 n.4 (W.D.N.Y. Sept. 1, 1989)) ("'conduct by both
parties which recognizes that agreement is not yet consummated establishes the non-
existence of a contract. . . .'").

        V Cars claims that "there is undisputed evidence that V Cars' New York
office generated the exchange of equity proposals in late August, 2006, that led to
Steinwascher's telephone calls to New York with the original 28/15/57 equity offer, and
V Cars' acceptance of such offer by email from New York."  (Pltf. Br. 5) (citing Pltf. R.
56.1 Stmt. ¶ 348)  But this proves nothing, because it is undisputed that the alleged
agreement as to an equity split was merely the predicate for further discussion.  See, e.g.,
September 12, 2006 Himelfarb email to Steinwascher ("I spoke with both [Arneberg] and

[Bricklin] who agree in principle with your one-third/two-third proposal.  <u>We would like to take the next step with you, [Gilad], and [Ofer]</u>."  (Pltf. R. 56.1 Stmt. Appx. Ex. 24) (emphasis added)  The alleged agreement concerning a 28/15/57 percent equity split did not create a binding contract or promise,[11] but was merely Israel Corp.'s predicate for further discussion.[12]

As <u>WHV, Inc.</u>, 1995 WL 296398, at *3, indicates, phone calls and emails to and from New York are not sufficient to justify the exercise of personal jurisdiction under the circumstances here.  "Courts have consistently held . . . that such correspondence with New York does not support the exercise of personal jurisdiction where the undisputed facts demonstrate that the defendant 'did not seek out a New York forum.'"  <u>Aquiline Capital Partners</u>, 2012 WL 1764218, at * 8 (quoting <u>Pryor, Cashman, Sherman & Flynn v. Haisfield</u>, No. 90–3586(RWS), 1990 WL 165687, at * 2-3 (S.D.N.Y. Oct. 26, 1990) (finding two meetings in New York and telephone calls and correspondence between New York and Florida insufficient to confer jurisdiction) and citing <u>PaineWebber Inc. v. Westgate Group, Inc.</u>, 748 F. Supp. 115, 119 (S.D.N.Y.1990) (holding that the defendant did not project itself into New York by sending numerous

---

[11]  V Cars' understanding that it had no binding agreement with Israel Corp. is evidenced by its continued discussions – throughout September and October 2006 – with other potential investors.  <u>See</u>, <u>e.g.</u>, Def. R. 56.1 Stmt. Appx. Ex. 61; Ex. 62; Ex. 10 (Himelfarb Dep.) at 121, 161-62; Ex. 63 (Bricklin 30(b)(6) Dep.) at 63-65; Ex. 65.

[12]  V Cars' reliance on <u>Hedlund v. Products From Sweden, Inc.</u>, 698 F. Supp. 1087 (S.D.N.Y. 1988) is misguided. First, in <u>Hedlund</u>, the court found that plaintiff had made a "sufficient" "prima facie showing" that the defendant had transacted business in New York.  <u>Hedlund</u>, 698 F. Supp. at 1091.  Second, in <u>Hedlund</u>, the joint venture negotiated in New York resulted in a substantial business agreement.  <u>Id</u>. at 1091-92.  Neither is true here.  <u>See</u> <u>Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates, & Pilots</u>, 636 F. Supp. 384, 390 (S.D.N.Y. 1986) (finding that the statements – "we're partners," and "we look forward to growing together" – were insufficient to constitute an action for promissory estoppel).

telecopies and faxes to plaintiff's New York offices where preliminary discussions and negotiations took place in Texas); JFP Touring, LLC v. Polk Theatre, Inc., 07 Civ. 3341 (CM), 2007 WL 2040585, at * 11 (S.D.N.Y. July 12, 2007) ("electronic communications, telephone calls, faxes or letters, in and of themselves, are generally not enough to establish jurisdiction").

Finally, V Cars has not demonstrated that Israel Corp. purposefully availed itself of a New York forum by soliciting business in New York. The dealings between these companies were the result of an inquiry by V Cars' Norwegian investment firm to Israel Corp. in Tel Aviv, resulting in a meeting between Israel Corp.'s German intermediary and V Cars' principals in Nice, France. (Def. R. 56.1 Stmt. ¶ 21, Ex. 22)[13]

The exercise of personal jurisdiction over Israel Corp. cannot be predicated on CPLR § 302(a)(1).

---

[13] To the extent V Cars contends that its misappropriation and unfair competition claims arise out of business transacted in New York (Pltf. Br. at 5), it fares no better. A "misappropriation claim cannot be said to arise from transactions of business in New York" where a New York meeting was merely "a link in the chain of events leading to the claim for which relief is sought." Acoustical Design, Inc. v. Control Elecs. Co., Inc., No. 86 CV 1692, 1987 WL 8066, *3 n.7 (E.D.N.Y. Feb. 24, 1987); Interface Biomed. Lab. Corp. v. Axiom Med. Inc., 600 F. Supp. 731, 737 (E.D.N.Y. 1985) (rejecting argument that § 302(a)(1) provided a basis for personal jurisdiction over misappropriation, unfair competition, and unjust enrichment claims; "courts have uniformly held that jurisdiction will not lie under § 302(a)(1) where contract negotiations were held in New York, but the alleged misappropriation of intellectual property occurred after either the contract negotiations broke down or the contract was breached." (citing Am. White Cross Labs., Inc. v. H.M. Cote, Inc., 556 F.Supp. 753, 759 (S.D.N.Y. 1983); Xedit Corp. v. Harvel Indus. Corp., 456 F.Supp. 725, 729 (S.D.N.Y. 1978); Sterling Television Presentations v. Shintron Co., 454 F. Supp. 183, 188 (S.D.N.Y. 1978)); Sterling Television, 454 F. Supp. at 188 (rejecting argument that § 302(a)(1) provided a basis for personal jurisdiction over misappropriation claim; "Clearly the unauthorized use occurred and the cause of action arose where the information was used in the manufacture of [defendant's] product, in its factory in Massachusetts. There was no transaction of business in New York out of which this cause of action arose, and no jurisdiction under Section 302(a)(1).")

**B.**      **Jurisdiction Based on Tortious Act Within New York**

"A court will have personal jurisdiction over a defendant, pursuant to § 302(a)(2), if the defendant 'commits a tortious act within the state.'" Virgin Enters. Ltd. v. Virgin Eyes LAC, No. 08 CV 8564 (LAP), 2009 WL 3241529, at * 4 (S.D.N.Y. Sept. 30, 2009) (quoting N.Y. C.P.L.R. § 302(a)(2) (McKinney 2001)). "[T]he New York Court of Appeals has interpreted [this] subsection to reach only tortious acts performed by a defendant who was physically present in New York when he committed the act." Id. (citing Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 460 (1965) ("Any possible doubt on this score is dispelled by the fact that the draftsmen of section 302 pointedly announced that their purpose was to confer on the court 'personal jurisdiction' over a non-domiciliary whose act in the state gives rise to a cause of action or, stated somewhat differently, 'to subject non-residents to personal jurisdiction when they commit acts within the state.'") (citations omitted)). "[I]n Bensusan Restaurant Corp. v. King, the [Second Circuit] declined to deviate from the New York Court of Appeals' decision in Longines-Wittnauer." Id. (citing Bensusan Restaurant Corp., 126 F.3d 25, 29 (2d Cir. 1997)).

Israel Corp. argues that there is no evidence that it committed a tortious act within New York.  (Def. Br. at 19)  V Cars counters that there is "uncontradicted evidence that Steinwascher made misrepresentations during his August meetings with V Cars in New York, that Gilad visited New York in early September and there made misrepresentations to V Cars, and that Steinwascher took documents from New York that form the basis of at least two counts of V Cars' First Amended Complaint."  (Pltf. Br. at

7)  V Cars claims that these actions were tortious, because "each was done with the knowledge that Ofer never intended for [Israel Corp.] to invest in V Cars."  (Pltf. Br. at 7)

There is no evidence, however, that Steinwascher and Gilad made actionable misrepresentations while meeting with V Cars in New York.  It is undisputed that neither made any promises or firm commitments to V Cars during these meetings. (See Pltf. R. 56.1 Stmt. Appx. Ex. B (Bricklin Dep.) at 86 (Q:  Did [Steinwascher] make any promises to you at that time?  A:  I don't believe on that date.  I think he simply said he thinks this is something that Israel Corporation would be interested in."); Def. R. 56.1 Stmt. Appx. Ex. 10 (Himelfarb Dep.) at 68 (Q:  Did Mr. Gilad make any promises to you during that meeting in New York?  A: I wouldn't say promises, no.)).

As to the allegation that Israel Corp. misappropriated confidential and proprietary trade secret information disclosed to Steinwascher and Gilad at the New York meetings, this claim is, of course, extraordinarily weak, given that V Cars has produced no evidence that either man ever signed a non-disclosure agreement, and both have denied doing so.  Assuming arguendo that V Cars has made out a prima facie case of misappropriation, this tort was not committed in New York but rather in China, where the trade secret information was allegedly used in connection with the newly formed joint venture between Chery and Israel Corp.  See Acoustical Design, Inc. v. Control Elecs. Co., Inc., No. 86 CV 1692, 1987 WL 8066, at *3 n.7 (E.D.N.Y. Feb. 24, 1987) (misappropriation action dismissed for lack of personal jurisdiction; § 302(a)(2) found not applicable where plaintiff's trade secrets were allegedly use to make a product in Canada; "[m]isappropriation is deemed to occur where the merchandise at issue is manufactured"); Sterling Television, 454 F. Supp. at 188 (misappropriation cause of

action arises where alleged trade secret information is used to manufacture a product);
R.F.D. Grp. Ltd. v. Rubber Fabricators, Inc., 323 F. Supp. 521, 524 (S.D.N.Y. 1971)
("The unlawful misappropriation of trade secrets occurred, if at all, in West Virginia,
where defendant's manufacturing plants are located; it certainly did not occur in New
York.  Consequently Section 302(a) 2 does not confer jurisdiction of the
misappropriation itself.").

        New York courts have narrowly construed Section 302(a)(2) to apply only
where a defendant's wrongful conduct took place in New York.  See, e.g., Longines-
Wittnauer Watch Co. v Barnes & Reinecke, 15 N.Y.2d 443, 464 (1965).  Here,
misappropriation – if it took place – occurred when Israel Corp. "'us[ed] trade secret
[information] in breach of an agreement, confidence, or duty'" in China.  Integrated Cash
Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990)
(quoting Rapco Foam, Inc. v. Scientific Applications, Inc., 479 F.Supp. 1027, 1029
(S.D.N.Y.1979)).[14]  Accordingly, personal jurisdiction over Israel Corp. cannot be
premised on CPLR § 302(a)(2).

    **C.**    **Jurisdiction Based on Injury in New York**

        Section 302(a)(3) allows for "a nondomiciliary who 'commits a tortious
act without the state causing injury . . . within the state' [to] be brought before a New
York court to answer for his conduct if he has had sufficient economic contact with the
State or an active interest in interstate or international commerce coupled with a
reasonable expectation that the tortious conduct in question could have consequences

---

[14]  V Cars presents no argument that the tort of conversion took place in New York, and
the Court is aware of no evidence that would support such an assertion.

within the State." <u>McGowan v. Smith</u>, 52 N.Y.2d 268, 273 (1981) (quoting N.Y.

C.P.L.R. § 302(a) (3)).

   Under Section 302(a)(3), any non-domiciliary who in person or through an

agent "commits a tortious act without the state causing injury to person or property within

the state" may be subject to personal jurisdiction if he "(i) regularly does or solicits

business, or engages in any other persistent course of conduct, or derives substantial

revenue from goods used or consumed or services rendered, in the state, or (ii) expects or

should reasonably expect the act to have consequences in the state and derives substantial

revenue from interstate or international commerce. . . ." <u>Bank Brussels Lambert v.</u>

<u>Fiddler Gonzalez & Rodriguez</u>, 171 F.3d 779, 790-91 (2d Cir. 1999)

   As to the first prong, V Cars has offered no evidence that Israel Corp.

regularly does or solicits business in New York, or that it derives substantial revenue

from goods or services used or consumed in New York. The events at issue in this case

likewise do not reveal a "consistent," "systematic," or "persistent course of conduct" in

New York. <u>See</u> <u>Ziegler, Ziegler & Assocs. LLP v. China Digital Media Corp.</u>, No. 05

Civ. 4960 (CM), 2010 WL 2835567, at *6 (S.D.N.Y. Jul. 13, 2010) ("Although

'[c]onsistent business visits to New York can . . . serve to establish a defendant's

connection to the forum under Section 302(a)(3)(i)," <u>Del Ponte v. Universal City</u>

<u>Development Partners, Ltd.</u>, No. 07-CV-2360 (KMK)(LMS), 2008 WL 169358, at *5

(S.D.N.Y. Jan. 16, 2008), such visits must be 'systematic.' <u>See</u> <u>Granada Television, Int'l.</u>

<u>v. Lorindy Pictures Int'l., Inc.</u>, 606 F. Supp. 68, 72 (S.D.N.Y. 1984) (finding sufficient

contacts where defendant owned property in New York and visited New York for 124

days in eighteen months)").

As to the second prong, it is undisputed that Israel Corp. is actively engaged in international commerce.  Israel Corp. argues, however, that it could not have reasonably foreseen that its allegedly tortious acts would have a direct consequence in New York.  Israel Corp. further argues that a reasonably foreseeable direct consequence in New York is not merely economic loss suffered by an entity that happens to be located in New York.  (Def. Br. at 20)  V Cars does not argue that it suffered an injury justifying the exercise of jurisdiction under Section 302(a)(3)(ii), but instead contends that personal jurisdiction over Israel Corp. exists under this provision because of injury suffered by Timothy Ciasulli, a car dealer who had invested $1.3 million in V Cars.  (Pltf. Br. 8; see Pltf. R. 56.1 Stmt. Appx. Ex. E (Ciasulli Decl.) ¶¶ 5-6)

V Cars claims that,

> [i]n return for his $1.3M investment, Ciasulli (together with V Cars' other investor dealers) was to receive a 15% equity interest in V Cars' North American distribution company, part of the 15% of V Cars' 40% equity interest in the Chery-[V Cars] [joint venture], and four contiguous dealer territories in which to exclusively sell the Chery-sourced cars manufactured by the Chery-[V Cars] [joint venture].

(Id.)  Ciasulli asserts that "'had the [Chery-V Cars] joint venture . . . been fully operational, . . . he would have sold thousands of cars to New York buyers.'"  (Id. (quoting Pltf. R. 56.1 Stmt. Appx. Ex. E (Ciasulli Decl.) ¶ 26))

"It has, however, long been held that the residence or domicile of the injured party within [New York] State is not a sufficient predicate for jurisdiction [under CPLR § 302], which must be based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there."  Fantis Foods, Inc. v. Standard Importing, Co., 49 N.Y.2d 317, 326 (1980).  "It is settled New

York law that the suffering of economic damages in New York is insufficient, alone, to establish a 'direct' injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes." Penguin Group (USA) Inc. v. Am. Buddha, 609 F.3d 30, 38 (2d Cir. 2010); see also Lehigh Valley Indus. v. Birenbaum, 527 F.2d 87, 94 (2d Cir. 1975) ("[S]ection 302(a)(3) is not satisfied by remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here.").

"[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" Bank Brussels Lambert, 171 F.3d at 791 (citing Hermann v. Sharon Hosp., Inc., 135 A.D.2d 682, 683 (2d Dept. 1987) ("The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff."); see also Weiss v. Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A., 85 A.D.2d 861, 862 (3d Dept. 1981) (quoting Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 433 (2d Cir. 1971)) ("[I]t has been held that the situs of a nonphysical, commercial injury is where 'the critical events associated with the dispute took place.'").

Here, the "original event" that caused V Cars' and Ciasulli's injuries, if any, took place in China, when Chery decided to embark on a joint venture with Israel Corp. Ciasulli's claimed injury is also entirely speculative, and thus does not provide a proper basis for the assertion of personal jurisdiction under Section 302(a)(3), which looks to a defendant's reasonable expectations. Personal jurisdiction over Israel Corp. cannot be exercised on the basis of CPLR § 302(a)(3).

## CONCLUSION

For the reasons stated above, Israel Corp.'s motion for summary judgment is granted.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 84), and to close this case.

Dated:  New York, New York
        September 30, 2012                    SO ORDERED.

                                             _____
                                             Paul G. Gardephe
                                             United States District Judge